# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
June 27, 2000 Session

## STATE OF TENNESSEE v. MATTHEW DOUGLAS COX

**Direct Appeal from the Criminal Court for Knox County**
**No. 61381, 66755     Richard Baumgartner, Judge**

---

**No. E1999-00351-CCA-R3-CD**
**October 20, 2000**

---

The appellant, Matthew Douglas Cox, appeals his convictions by a jury in the Knox County Criminal Court of two counts of aggravated rape and one count of incest.  The trial court imposed concurrent sentences of twenty years incarceration in the Tennessee Department of Correction for the aggravated rape convictions and three years incarceration for the incest conviction.  On appeal, the appellant presents the following issues for our review: (1) whether the evidence adduced at trial supports his convictions of aggravated rape and incest; (2) whether the trial court erroneously admitted into evidence a tape recording of the victim's 911 telephone call; (3) whether the trial court erred in effectively limiting defense counsel's cross-examination of the State's expert witness concerning the results of a DNA analysis of semen samples obtained from the victim; (4) whether the trial court erred in admitting into evidence testimony concerning the circumstances of the appellant's arrest; (5) whether the State committed prosecutorial misconduct during closing argument; and (6) whether the cumulative effect of these errors requires the reversal of the appellant's convictions.  Following a review of the record and the parties' briefs, we affirm in part and reverse in part the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed in Part and Reversed in Part.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR.J., joined. DAVID G. HAYES, J. not participating.

Mark E. Stephens, District Public Defender, and R. Scott Carpenter, Assistant District Public Defender, for the appellant, Matthew Douglas Cox.

Paul G. Summers, Attorney General and Reporter, R. Stephen Jobe, Assistant Attorney General, Randall E. Nichols, District Attorney General, and G. Scott Green, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I.  Factual Background

The appellant's convictions of aggravated rape and incest arose from the rape of his sister, PC,[1] on March 2, 1996, at the appellant's home in Knoxville, Tennessee. At the appellant's trial, PC testified that, although separated during their childhood due to their parents' divorce, she and the appellant developed a close sibling relationship during the 1990s. PC recounted that she frequently visited her brother at his home and, in January of 1996, only months before the instant offenses, she and the appellant traveled together to Gatlinburg to attend a friend's wedding and also stayed overnight together in Cherokee, North Carolina, staying in a single hotel room but sleeping on different beds. Moreover, in mid- to late-February 1996, following her brother's separation from his wife, PC and the appellant agreed that she would move from her home in Bristol, Tennessee, to the appellant's home in Knoxville. PC intended to assist her brother with his plumbing business, which he was currently conducting from his home, and also intended to launch a career with Mary Kay Cosmetics. She was particularly pleased about this arrangement because her son, Ray Pope, lived in Knoxville.

PC arrived at the appellant's home on March 2, 1996, at approximately 2:00 a.m. The appellant was asleep on the couch in the living room. However, he awoke upon his sister's arrival, and the two siblings talked for approximately one and one half hours. During this time, PC consumed two beers, and the appellant consumed a mixed alcoholic beverage. Afterwards, at approximately 3:00 a.m. or 3:30 a.m., PC went to sleep in the master bedroom.

PC was awakened at approximately 4:00 a.m. or 5:00 a.m., when the appellant began fondling her vagina. PC asked the appellant to stop, whereupon the appellant apologized for his conduct and promised that he would not touch his sister again. Extremely disturbed, PC went to the living room where she sat on the couch and waited for her brother to fall asleep. At some point, PC fell asleep on the couch, only to be awakened at approximately 7:00 a.m. by her brother, who was once again fondling her vagina. PC again asked the appellant to stop, and the appellant again apologized.

Following the second incident, PC brewed a pot of coffee and went outside to get the newspaper. As she was picking up the newspaper, she noticed the appellant's next-door neighbor and waved at him. She then took the newspaper and a cup of coffee and sat beside the appellant's swimming pool. When she returned inside the house, the appellant inquired whether she still intended to live with him. PC refused to talk with the appellant and, instead, prepared to go out for the day, intending to go to a beauty salon and also visit her son. PC recalled that, at approximately 10:30 a.m., she took a shower, cleaning herself thoroughly.

When PC emerged from the shower, the appellant was standing in the bathroom. He was naked and was holding a knife. PC asked the appellant what he was doing, and he responded, "You have always said, 'I hate you.' Well, I am going to make it true." The appellant grabbed the back of PC's head and held the knife to her throat, insisting that she cooperate with him. He then

---

[1] It is the policy of the author of this opinion to refer to *all* victims of sexual offenses by their initials.

threw his sister across the hallway into one of the bedrooms. PC recalled that the appellant dropped the knife in the hallway.

In the bedroom, the appellant pushed his sister down onto the bed and attempted to climb on top of her. PC struggled with the appellant, using her arms and legs. At trial, she related to the jury that

> I was trying to kick his personals; because I thought, if I could kick him hard enough, I would have a chance to get out of there, but I couldn't kick him. I finally got him kicked off to the side in the bed. It sounded like he hit aluminum - - aluminum siding, aluminum windows or something. So I took off out the door. And I got to the front door, and I tried to get it open, and I remember screaming, 'Rape,' and then he come behind me and slammed the door shut and grabbed me by the hair again and took me back to the bedroom.
>
> * * *
>
> He said, "If you try running again, I will kill you," and then he throwed me on the bed, and he started choking me, and choking me, and choking me.

When the appellant released PC's neck, she requested something to drink. The appellant agreed but insisted that he accompany PC to the kitchen and that he hold her hand. In the kitchen, PC poured vodka and orange juice into a glass and drank the mixture. At trial, PC explained, "I figured, if I was going to die, I might as well not feel a lot of it." The appellant also made himself a drink.

Afterwards, the appellant and PC returned to the bedroom where the appellant grabbed PC by the ears and attempted to force PC to perform oral sex upon him. When his attempts proved unsuccessful, the appellant performed oral sex upon PC, penetrating her vagina with his tongue. According to PC, she had "lost the will to fight" at this point. The appellant next rubbed PC's vagina with an object, possibly a vibrator, and placed the object in PC's rectum. PC recalled that she experienced some pain and bit her own arm. Finally, the appellant attempted to engage in penile penetration of PC's vagina. Initially, the appellant had some difficulty achieving penetration because he did not have an erection. PC confirmed, however, that the appellant did ultimately penetrate her vagina with his penis. PC could not recall whether the appellant ejaculated during intercourse.

Following the rapes, the appellant informed his sister that she could leave. However, before PC departed, the appellant and PC drank coffee together. PC then collected all her belongings and carried them to her car. PC also briefly returned inside the appellant's home to retrieve her Mary Kay Cosmetics bag and a bottle of vodka. PC testified at trial that at no time did she indicate to the appellant that she intended to report the rapes to the police. She explained that she was afraid that the appellant would kill her. In parting, the appellant stated to PC that "he wasn't worth living; that he thought he would kill himself."

As PC drove out of the appellant's driveway, she heard a sound that was similar to a gunshot. She then called 911 on her cellular telephone. At trial, the State introduced into evidence a tape recording of PC's conversation with the 911 operator at approximately 1:00 p.m. on March 2, 1996. During this conversation, PC identified herself and asked that an officer be sent immediately to her brother's address because she believed that her brother had committed suicide. PC also reported that, earlier that morning, her brother had assaulted her with a knife as she was coming out of the shower and had raped her. PC stated that her brother had held her hostage for a total of approximately two hours. Finally, PC indicated that she was driving to her son's residence. PC was crying during the conversation and had difficulty recalling her son's address or telephone number.

Ray Pope, PC's son, also testified at the appellant's trial. He recounted that, on March 2, 1996, he arrived home to find his mother "curled up in a fetal position" on the couch in his living room. According to Pope,

> [PC] was crying. She was shaking all over. She didn't look like she
> had herself put together - - you know, like hair and makeup. When
> I approached her, she jumped and flinched like she was afraid of me.

"[T]hrough tears and sobs," PC explained to her son that the appellant had raped her. Soon thereafter, the police arrived and, after speaking with PC, transported her and Pope to the Emergency Department at the University of Tennessee Hospital. During the trip to the hospital, PC "was crying, and she seemed very scared. Every little movement made her jump, and she just cried a lot."

At trial, Pope also described his mother's condition during the week following the appellant's offenses:

> She was just terrified the whole time. Like I said, every movement
> scared her. She cried all the time. Anytime that she did go to sleep,
> which wasn't very often, she would wake up screaming, "Please
> stop," and "Help me," and, "Don't," just continuously.

Moreover, Pope testified that, during that week, he noticed that his mother had several bruises, including bruises around her ears, bruises on her throat, and a bruise on her arm that looked like "finger marks."

Several police officers, including Officer Savannah Ayub and Detective Ed Stair of the Knoxville Police Department, spoke with PC at her son's home immediately following these offenses. At trial, Ayub confirmed that, at that time, PC "was curled up, and crying, and distraught." Stair similarly confirmed that PC was "real emotional." Ayub transported PC and her son to the University of Tennessee Hospital. Like Pope, Ayub testified at trial that, during the trip to the hospital, PC was "crying the whole time, very upset, and in shock."

PC arrived at the hospital at approximately 3:30 p.m. on March 2, 1996. At the hospital, Dr. Christopher Brooks, an Emergency Department physician, examined PC. He observed that she was "very agitated and tearful, but was awake, alert, oriented, and cooperative." According to Dr. Brooks, PC provided the following account of the appellant's offenses:

She told me that she had been raped at about 10:30 a.m. that morning. She said that she was penetrated vaginally and also that there was rectal penetration by an unknown object. She said the perpetrator was using a vibrator, so this could have been the object that penetrated her rectum. She was not aware of whether the perpetrator ejaculated or not. She said she was choked one time. Her hair was pulled, and she was hit on the left side of her head, but she did not lose consciousness. She denied any trauma to her chest or abdomen or her extremities, and she did remark that she had bitten her own right forearm during the attack.

Dr. Brooks' physical examination of PC revealed a small bruise on the left side of her neck and a bite mark on her right forearm. The doctor did not observe any other obvious external injuries but noted that, depending upon an assault or rape victim's physical characteristics and the amount of force applied by a defendant, different victims will bruise to varying degrees and will develop bruises at different rates, sometimes over several hours and sometimes over several days. The doctor also did not observe any trauma to PC's rectum. However, the doctor testified that the absence of trauma was not inconsistent with rectal penetration. Finally, while the doctor did not observe any trauma to PC's external genitalia, he did notice "a few scattered areas of apparent abrasions at the vaginal cuff, but no active bleeding." The doctor opined that the abrasions were consistent with the insertion of a penis into PC's vagina within the preceding two or three days.

Dr. Brooks also obtained at least five vaginal swabs from PC and, at approximately 4:00 p.m. on March 2, examined one of the swabs under a microscope. He observed "very rare [i.e., a small number of] nonmotile sperm." The parties stipulated at trial that the appellant is capable of producing motile sperm. Nevertheless, Dr. Brooks testified that various factors can affect the motility of one's sperm, including a common cold or the ingestion of certain drugs. Moreover, the doctor noted that most sperm lose motility in as few as three hours after the sperm has left the male body.

PC returned to the Emergency Department at the University of Tennessee Hospital on March 4, 1996, for a follow-up examination. At that time, PC complained of pain in her neck, and the attending physician noted that her trapezius or "the muscular structure on the lateral side of . . . [her neck]" was slightly tender. The physician did not record his observation of any other physical injuries. The physician did, however, diagnose PC with "situational anxiety." At trial, Dr. Brooks opined that situational anxiety is a common phenomenon in rape victims.

Kelly Smith, a forensic serologist employed by the Tennessee Bureau of Investigation, testified at the appellant's trial that she had examined the vaginal swabs obtained from PC during her examination by Dr. Brooks. Smith stated that she detected semen on the vaginal swabs. Additionally, Joe Minor, an expert in RFLP (restriction fragment length polymorphism) DNA analysis employed by the Tennessee Bureau of Investigation, testified that he performed an RFLP DNA analysis of the semen and of blood samples obtained from the appellant, but, due to the small quantity of semen, the results of his analysis were inconclusive. In response to questioning

by the State, Minor further stated that the inconclusive results did not exclude the appellant as the possible source of the semen.

Sergeant Larry Grant, an officer with the Knoxville Police Department, testified at trial that he visited the appellant's residence on March 2, 1996, pursuant to PC's report of a possible suicide. According to Grant, he did not intend to arrest the appellant, as PC had not yet indicated whether she wished to file a complaint. Grant's visit to the appellant's residence occurred at approximately 1:50 p.m. When he arrived, Grant knocked on the appellant's front door but received no response. Grant then spoke with the appellant's next-door neighbor, who indicated that, if the appellant's truck was parked beside the appellant's house, the appellant was at home. Because the appellant's truck was indeed present, Grant knocked on the appellant's front door once again. This time, the appellant opened the door. According to Grant, the appellant appeared to be intoxicated but, in response to the sergeant's inquiry, indicated that he was fine. Having ascertained that the appellant had not committed suicide, Grant departed.

On March 4, PC filed a complaint with the Knoxville Police Department, providing a formal, written statement to Detective Stair, which statement was largely consistent with PC's testimony at trial. Upon receiving this statement, Stair telephoned the appellant and left a message on the appellant's answering machine asking that he call the police department as soon as possible. The appellant returned the detective's call, and the detective asked the appellant to come to the police department for questioning. The detective explained that PC had accused the appellant of raping her. At this point, the appellant responded, "Well, I probably did, but I don't remember it," and refused to come to the police department for an interview. Stair recalled at trial that the appellant sounded intoxicated during their conversation.

On March 6, 1996, Kelvin Reed, an officer with the Knoxville Police Department, was instructed to execute a warrant for the appellant's arrest. Accordingly, he and another Knoxville police officer, Anthony Guida, drove to the appellant's residence. The officers parked in front of a next-door neighbor's house and walked to the appellant's front door. As Officer Reed knocked on the appellant's front door, he also looked through a window in the door and observed the appellant running through the house carrying a rifle. Officer Reed and Officer Guida immediately retreated and radioed for assistance. Numerous police officers responded to the officers' request for assistance and surrounded the appellant's house. During the ensuing stand-off, the appellant exited a rear door of his house and briefly spoke with several officers before withdrawing into the house once again. Shortly thereafter, the appellant exited the front door of his house and surrendered to the police. Approximately twenty minutes passed between the officer's knock on the appellant's front door and the appellant's surrender to the police.

The appellant testified on his own behalf at his trial. The appellant testified that he is a master plumber and currently lives in Knoxville with his wife. The appellant further recounted that, in 1996, he and his wife temporarily separated. The appellant then began drinking heavily on a regular basis. More specifically, the appellant recalled that, on March 1, 1996, he began drinking at approximately 1:00 p.m. or 2:00 p.m. in the afternoon and continued to drink during that evening until he fell asleep or passed out. He asserted at trial that, therefore, he could not recall any of the

events that occurred on March 2, 1996. He could not recall his sister's arrival at his home at 2:00 a.m., he could not recall his subsequent offenses, and he could not recall his sister's departure. According to the appellant, he did not even discover that PC had visited his home until March 3.

The appellant also testified at his trial that he could not recall speaking with Detective Stair on March 4. However, he *was* able to recall his arrest on March 6. He explained to the jury that he did not immediately surrender to the police because he was frightened and because, when the police arrived, he spoke on the telephone with a friend, Dan Acosta, who instructed the appellant to remain inside his house until Acosta's arrival. The appellant surrendered to the police as soon as his friend arrived at the house.

The appellant suggested at his trial that his sister had fabricated her accusations of rape, noting that, prior to these offenses, his sister had threatened revenge against the appellant due to an incident at the appellant's home in 1993, during which her son was arrested and incarcerated in jail. However, the appellant conceded that, prior to these offenses, he had had a "decent relationship" with PC and that she had visited his home at least once every three months between the 1993 arrest of her son and the instant offenses. The appellant also confirmed that he had traveled with PC to Gatlinburg in January of 1996 and that he and his sister had discussed her possible relocation to Knoxville and, more specifically, her move into his home. Finally, the appellant conceded that, following the 1993 incident and prior to these offenses, he regularly ate dinner with PC's son.

Dan Acosta, a friend and business partner of the appellant, testified that he had known the appellant for eight years. According to Acosta, in December of 1995 and in early 1996, the appellant became very depressed and began drinking excessively. As a result of his drinking, the appellant also began to miss work. On March 1, 1996, the appellant again failed to appear at work, and Acosta spoke with him at his home. At that time, the appellant was drunk but was also cleaning his house in preparation for his sister's imminent arrival.

Acosta next spoke with the appellant on March 4 when the appellant once again failed to appear at work. Acosta visited the appellant's home during the late morning hours. According to Acosta, the appellant was drunk and appeared to be distraught. The appellant informed Acosta that his mother or one of his sisters had telephoned him and told him that he had raped his sister. The appellant admitted to Acosta that he could recall his sister arriving in the early morning hours of March 2 and could recall speaking with her over drinks. However, he asserted that his last memory of March 2 was his sister going to the kitchen to get him a drink.

After listening to the appellant's account and providing some encouragement to the appellant, Acosta departed for work. However, he returned to the appellant's house later that day. The appellant was still drinking, although he appeared to be somewhat less intoxicated, and was still distraught. The appellant informed Acosta that a detective was attempting to contact him and that, therefore, he was refusing to answer his telephone. Acosta convinced the appellant to speak with the detective over the telephone and was present during the ensuing telephone conversation. Acosta

denied at trial that he ever overheard the appellant state to the detective, "I probably did, but I don't remember."

Acosta next visited the appellant on March 6. The appellant was still refusing to answer his telephone, and, before departing, Acosta again advised the appellant to communicate with the police. As Acosta was driving away from the appellant's home, however, the thought occurred to him that the police might soon attempt to arrest the appellant at his home. Accordingly, he called the appellant on his cellular telephone. The appellant informed Acosta that the police were currently surrounding his home. Acosta then instructed the appellant to remain inside his home until Acosta arrived. Acosta testified at trial that, when he arrived at the appellant's home, there were numerous police officers surrounding the home and shouting conflicting instructions at the appellant. Acosta obtained instructions from the officer in charge and relayed those instructions to the appellant. At that point, the appellant surrendered to the police.

James Leffew, the appellant's friend and next-door neighbor, also testified on the appellant's behalf. He related to the jury that his house is only twenty or twenty-four feet apart from the appellant's house. Leffew recalled that, on March 2, 1996, he was awake all night and, at 2:00 a.m., heard a man's and a woman's voices talking and laughing. The voices were coming from the direction of the appellant's home, but the man's voice did not belong to the appellant. The voices persisted until approximately 3:30 a.m. Subsequently, at 5:00 a.m., Leffew observed a car leaving the appellant's house. At approximately 9:00 a.m., Leffew also observed the appellant's sister, PC, outside the appellant's house, placing clothes and other belongings into the trunk of her car. By approximately 10:00 a.m., PC's car was gone.

Between 10:00 a.m. and 11:00 a.m., Leffew heard a loud noise, "like a cannon going off," which came from the direction of the appellant's home. Leffew walked to the appellant's home and knocked on the door. When the appellant failed to respond, Leffew opened the unlocked door and entered the house, discovering the appellant alone inside. The appellant was intoxicated and wearing the same clothes that he had been wearing on the previous day. Upon investigation, Leffew determined that the loud noise had been caused by "dividers" falling and striking hardwood flooring. Leffew then assured himself that the appellant was all right and returned to his own home. According to Leffew, the police arrived at the appellant's home later that day, at approximately 12:00 p.m. The police spoke with Leffew and, upon learning that the appellant was intoxicated, departed.

Lorene Leffew, James Leffew's ex-wife, testified at trial that she lived with her ex-husband next door to the appellant. She testified that, although she could generally hear noises coming from the appellant's house when she was inside her own house, she heard nothing on the morning of March 2, 1996. She also confirmed that, on the night of March 1, 1996, and in the early morning hours of March 2, her ex-husband was having difficulty sleeping. She confirmed that her ex-husband spoke with the appellant's sister, PC, between 10:00 a.m. or 10:30 a.m. on March 2. Finally, Ms. Leffew confirmed that, later that morning, she and her ex-husband heard a loud noise that came from the direction of the appellant's home, and her husband visited the appellant to ensure

that he was all right. At trial, Ms. Leffew could not recall seeing any police officers on March 2 nor could she recall her husband mentioning any police officers to her.

The appellant was indicted by a Knox County Grand Jury on September 18, 1996, for three counts of aggravated rape. On November 4, 1998, upon agreement by the appellant, the State additionally filed an information charging the appellant with one count of incest. On the same day, the appellant proceeded to trial on the above charges. Following the State's case-in-chief, the trial court granted the appellant's motion for a judgment of acquittal with respect to one count of aggravated rape. At the conclusion of the trial, the jury found the appellant guilty of the remaining two counts of aggravated rape and one count of incest. The trial court imposed concurrent sentences of twenty years incarceration in the Tennessee Department of Correction for the aggravated rape convictions and three years incarceration for the incest conviction.

## II. Analysis

**a.      Sufficiency of the Evidence**

The appellant first challenges the sufficiency of the evidence underlying his convictions of aggravated rape and incest. When the sufficiency of the evidence is challenged on appeal, our standard of review is whether any "reasonable trier of fact" could have found the essential elements of the offenses beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e). In other words, the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). In contrast, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefore. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact and not the appellate courts. State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both. State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998), cert. denied, 526 U.S. 1052, 119 S. Ct. 1359 (1999).

In order to find the appellant guilty of the aggravated rape offenses charged in the indictment, the jury was required to find beyond a reasonable doubt that (1) the appellant engaged in sexual penetration of PC; (2) the appellant used force or coercion to accomplish the penetration; (3) the appellant was armed with a weapon; and (3) the appellant acted intentionally. Tenn. Code Ann. § 39-13-502(a)(1) (1997).[2] For the first count, the State relied upon the appellant's penetration of PC's vagina with his tongue. For the second count, the State relied upon the appellant's penile penetration of PC's vagina.

In order to find the appellant guilty of incest, the jury was required to find beyond a reasonable doubt that (1) the appellant engaged in sexual penetration of PC; (2) PC is the appellant's

---

[2]Although the offense of aggravated rape generally entails an intentional, knowing, or reckless mental state, Tenn. Code Ann. § 39-11-301(c)(1997), the State specifically charged an intentional mental state in the indictment, and the trial court so instructed the jury.

sister; (3) the appellant knew that PC is his sister; and (4) the appellant acted intentionally, knowingly, or recklessly. Tenn. Code Ann. § 39-15-302(a)(2) (1997). We note that the State failed to elect the specific incident of penetration upon which it was relying to establish incest.

Initially, we need not address the sufficiency of the evidence underlying the appellant's conviction of incest because, although the appellant has not raised in this appeal the State's failure to elect a specific incident of penetration for the charge of incest, the State's omission and the trial court's failure to require an election constitute plain error. State v. Walton, 958 S.W.2d 724, 727-728 (Tenn. 1997); State v. Keen, No. 01C01-9804-CR-00192, 1999 WL 254384, at *2 (Tenn. Crim. App. at Nashville, April 30, 1999); Tenn. R. Crim. P. 52(b). As noted previously, the evidence adduced at trial established three separate incidents of penetration within a two hour period of time: penetration of PC's vagina by the appellant's tongue; penetration of PC's anal opening by an unidentified object; and penile penetration of PC's vagina. Each penetration could have supported a separate conviction of incest. Cf. State v. Phillips, 924 S.W.2d 662, 664-665 (Tenn. 1996); cf. also State v. Hoxie, 963 S.W.2d 737, 742-743 (Tenn. 1998). The State only charged one count of incest. We have previously observed that "[i]n cases where there are more instances of criminal behavior proven than there are counts to accommodate them, the state must match specific conduct to a specific count." State v. Hallock, 875 S.W.2d 285, 292-293 (Tenn. Crim. App.1993); see also Walton, 958 S.W.2d at 727; Tidwell v. State, 922 S.W.2d 497, 501 (Tenn. 1996); Burlison v. State, 501 S.W.2d 801, 804 (Tenn.1973); Keen, No. 01C01-9804-CR-00192, 1999 WL 254384, at *2. Accordingly, we must reverse the appellant's conviction of incest and remand that case to the trial court for a new trial. State v. Brown, 992 S.W.2d 389, 392 (Tenn. 1999).

As to the appellant's convictions of aggravated rape, the appellant's challenge to the sufficiency of the evidence is predicated, in part, upon the credibility of PC's testimony. Specifically, the appellant argues that "[t]he assault as described by . . . [PC] cannot be judged credible given the objective observations of the state's expert testimony concerning the scant injuries sustained by . . . [PC]." Moreover, the appellant notes the parties' stipulation that the appellant is capable of producing motile sperm and Dr. Brooks' observation of nonmotile sperm on a vaginal swab obtained from PC.

In essence, the appellant appears to be invoking the "physical facts rule," a limited exception to the general rule that questions concerning the credibility of witnesses are exclusively within the province of the jury. See State v. Hornsby, 858 S.W.2d 892, 894-895 (Tenn. 1993). In Hornsby, 858 S.W.2d at 894-895 (citations omitted), our supreme court explained the parameters of the "physical facts rule":

> The so-called "physical facts rule" is the accepted proposition that in cases where the testimony of a witness is entirely irreconcilable with the physical evidence, the testimony can be disregarded. That is, where the testimony of a witness "cannot possibly be true, is inherently unbelievable, or is opposed to natural laws," courts can declare the testimony incredible as a matter of law and decline to consider it. . . . [T]he facts used to negate testimony must be "well-established and universally recognized physical laws."

-10-

The supreme court in Hornsby cautioned that the power to disregard oral testimony should be used sparingly, reaffirming that "[w]hen the testimony is capable of different interpretations, the matter should be left for the jury to decide as the sole arbiter of credibility." Id. at 895; see also, e.g., State v. McBride, No. M1999-00319-CCA-R3-CD, 2000 WL 374912, at **5-6 (Tenn. Crim. App. at Nashville, April 7, 2000), perm. to appeal denied, (Tenn. 2000); State v. Martin, No. 03C01-9803-CR-00103, 1999 WL 692864, at **3-4 (Tenn. Crim. App. at Knoxville, August 26, 1999), perm. to appeal denied, (Tenn. 2000); State v. Bacon, No. 03C01-9608-CR-00308, 1998 WL 6925, at *8 (Tenn. Crim. App. at Knoxville, January 8, 1998).

In this case, the appellant is unable to cite a "well-established and universally recognized physical law" that renders PC's account of the appellant's offenses inconsistent as a matter of law with the evidence adduced at trial concerning her injuries. Indeed, as noted previously, Dr. Brooks concluded at trial that the extent of bruising resulting from an assault or rape and the rate at which the bruising develops varies depending both upon the amount of force applied by the assailant *and* upon various physical characteristics of the victim.

Similarly, the parties' stipulation concerning the appellant's ability to produce motile sperm and Dr. Brooks' observation of nonmotile sperm on a vaginal swab obtained from PC in no way precluded the jury's accreditation of PC's testimony pursuant to the "physical facts rule." Again, Dr. Brooks examined the vaginal swab obtained from PC more than three hours after the appellant's offenses. At trial, he testified that most sperm lose their motility in as few as three hours after the sperm has left the male body. Although Dr. Brooks conceded that some motile sperm would remain after three hours, Dr. Brooks examined only one of at least five vaginal swabs obtained from PC, and the examined vaginal swab contained a very small amount of sperm. Under these circumstances, this court will not disturb the jury's findings.

We note in passing that the appellant additionally argues that "the unimpeached, unbiased testimony of Lorene and James Leffew . . . proves that . . . [PC's] testimony was false." Suffice it to say that "'[t]he improbability of the truth of testimony, which justifies rejection under the physical facts rule, cannot rest upon any theory involving the consideration of the comparative credibility of the witnesses.'" Hornsby, 858 S.W.2d at 896.

Finally, in challenging the sufficiency of the evidence underlying his convictions of aggravated rape, the appellant contends that the State failed to establish that he was armed with a weapon as required by Tenn. Code Ann. § 39-13-502(a)(1). Moreover, he asserts that, regardless of the requirements of Tenn. Code Ann. § 39-13-502(a)(1), the indictment charged him with sexually penetrating PC "*while* armed with a weapon." We agree with the State that, to the extent that language in the indictment, i.e., "while," exceeds the requirements of aggravated rape set forth in Tenn. Code Ann. § 39-13-502(a)(1), such language is mere surplusage and did not add to the State's burden of proof at trial. See, e.g., State v. Irick, 762 S.W.2d 121, 128-129 (Tenn. 1988); State v. Culp, 891 S.W.2d 232, 236 (Tenn. Crim. App. 1994); State v. Hopper, 695 S.W.2d 530, 535 (Tenn. Crim. App. 1985). Moreover, we agree with the State that Tenn. Code Ann. § 39-13-502(a)(1) does not require the State to establish that the appellant was armed with a weapon during his penetration of PC but only to establish that the appellant's possession of a weapon "occurred in association with

-11-

the unlawful sexual penetration, whether . . . [the possession] occur[red] before, during, or after the actual sexual penetration." Cf., e.g., Locke v. State, 771 S.W.2d 132, 136 (Tenn. Crim. App. 1988); State v. Suggs, No. 02C01-9703-CR-00089, 1998 WL 43310, at *2 (Tenn. Crim. App. at Jackson, February 5, 1998). In this case, the appellant initiated his two-hour sexual assault upon his sister by holding a knife to her throat and insisting that she cooperate with him. We conclude that the evidence was sufficient to support the jury's verdicts of guilt of aggravated rape. This issue is without merit.

### b.      911 Telephone Call

The appellant next challenges the trial court's admission at trial of a tape recording of PC's 911 telephone call on March 2, 1996. Specifically, the appellant challenges the trial court's admission of the contents of the recording, asserting that PC's statements to the 911 operator were admissible neither as excited utterances nor as a fresh complaint. Moreover, the appellant argues that the contents of the recording were needlessly cumulative of PC's testimony at trial, and the emotional impact of the recording was unfairly prejudicial, substantially outweighing any probative value.

At trial, the appellant submitted a pre-trial motion to exclude from evidence the contents of the 911 tape recording, citing grounds identical to those raised in this appeal. Following a pre-trial hearing, the court concluded:

> Now, with regard to the 911 tape, I believe the 911 tape is an excited utterance. . . . It is clear, after listening to that tape, that she was under the stress of this event that had just occurred. She is extremely emotional. She relates the events without any questioning or any leading questioning by the E-911 operator. I believe that to be an excited utterance.

The trial court did not expressly address the cumulative nature of the contents of the recording or otherwise weigh their probative value against any danger of unfair prejudice.

The admissibility of the contents of the 911 tape recording was a matter subject to the sound discretion of the trial court, and this court will not reverse the court's ruling absent a clear showing of abuse of discretion. State v. Hall, 976 S.W.2d 121, 151 (Tenn. 1998); State v. Chearis, 995 S.W.2d 641, 645 (Tenn. Crim. App. 1999). Accordingly we will first address the admissibility of PC's statements to the 911 operator pursuant to Tenn. R. Evid. 803(2). That rule provides that an excited utterance is excluded from the general rule prohibiting the introduction into evidence of hearsay statements and defines an exited utterance as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Id. One noted authority has described the rationales underlying this exception:

> First, since this exception applies to statements where it is likely there was a lack of reflection - and potential fabrication - by a declarant who spontaneously exclaims a statement in response to an exciting event, there is little likelihood, in theory at least, of insincerity. Rule 803(2) requires that the declarant must labor under the stress of excitement while speaking. . . . Second, ordinarily the statement is

made while the memory of the event is still fresh in the declarant's
mind. This means that the out-of-court statement about an event may
be more accurate than a much later in-court description of it.

COHEN, SHEPPEARD, AND PAINE, TENNESSEE LAW OF EVIDENCE § 803(2).1, at 532 (Michie ed., 3d ed. 1995).

Thus, in order to justify reliance upon the excited utterance exception to the hearsay rule, the State was required to establish three elements. First, it was required to demonstrate that there was a startling event. State v. Gordon, 952 S.W.2d 817, 820 (Tenn. 1997).

Although the "startling event" is usually the act or transaction upon
which the legal controversy is based, such as an assault or accident,
the exception is not limited to statements arising directly from such
events; rather, a subsequent startling event or condition which is
related to the prior event can produce an excited utterance.

Id.; State v. Snider, No. W1999-01849-CCA-R3-CD, 2000 WL 1224758, at *8 (Tenn. Crim. App. at Jackson, August 18, 2000). In any event, "the 'event must be sufficiently startling to suspend the normal, reflective thought processes of the declarant.'" Id. (citation omitted).

In this case, the record reflects that, shortly before the 911 telephone call, PC was raped by her brother. To say the very least, rape is a startling event. State v. Rucker, 847 S.W.2d 512, 517 (Tenn. Crim. App. 1992); State v. Edmonds, No. 02C01-9708-CC-00334, 1998 WL 527232, at *8 (Tenn. Crim. App. at Jackson, August 25, 1998). Moreover, following the rape, the appellant communicated to PC his intention to commit suicide because he had raped her. As PC was driving away from the appellant's house and immediately prior to her 911 telephone call, she heard a loud noise that was similar to a gunshot issue from the appellant's house. The loud sound was clearly a "subsequent startling event or condition which [wa]s related to the [rape]." Gordon, 952 S.W.2d at 820.

Second, the State was required to establish that PC's statements to the 911 operator were related to the startling events. Gordon, 952 S.W.2d at 820. "[C]onsiderable leeway is available" in the application of this requirement. Id. In this case, there is no dispute that PC's statements were related to both of the above startling events.

Third and finally, the State was required to establish that PC's statements were made while she was under the stress or excitement of the startling events. Id. In this regard, the appellant argues in his brief that, at the time of the 911 telephone call, PC's "reason ha[d] returned." He notes that PC was capable of dressing herself following the rape, collecting her belongings, and departing the appellant's residence. Moreover, she was able to call 911 and speak with the operator while driving to her son's residence. However, the appellant cites no authority for the proposition that the declarant of an excited utterance must be *completely* bereft of reason. Indeed, our supreme court and this court have previously held that the return of a measure of calm to a declarant prior to making a statement does not preclude the application of Tenn. R. Evid. 803(2). See, e.g., State v. Smith, 868 S.W.2d 561, 574 (Tenn. 1993); State v. Johnson, No. 03C01-9901-CR-00009, 1999 WL 1052006,

at \*4 (Tenn. Crim. App. at Knoxville, November 12, 1999), <u>perm. to appeal denied</u>, (Tenn. 2000); <u>State v. Bacon</u>, No. 03C01-9608-CR-00308, 1998 WL 6925, at \*11 (Tenn. Crim. App. at Knoxville, January 8, 1998).

Rather, a determination that a declarant was under the stress or excitement of startling events depends upon a court's consideration of all of the following factors: (1) the time interval between the startling event and the statement; (2) the nature and seriousness of the event; (3) the appearance behavior, outlook, and circumstances of the declarant; and (4) the contents of the statement itself, which may indicate the presence or absence of stress. <u>Gordon</u>, 952 S.W.2d at 820. Again, the primary startling event in this case, PC's rape by her brother, had occurred, approximately, within the two hours preceding the 911 telephone call, and there are few more serious events than one's rape by a close family member. Moreover, the impact of the rape upon PC was undoubtedly enhanced by the second, closely related startling event, i.e., the loud noise, and PC's consequent belief that her brother had committed suicide because of the rape. Indeed, the tape recording of PC's telephone conversation with the 911 operator reveals that PC was crying during the conversation and was unable to recall the name of the street on which her son lived, the name of the apartment complex in which he lived, or her son's telephone number. Shortly after PC's 911 telephone call, PC's son arrived home and discovered his mother "curled up in a fetal position" on his couch. She was crying and shaking. Under these circumstances, we conclude that the trial court could find that, at the time of PC's statements to the 911 operator, she was operating under the stress or excitement both of her rape by her brother and of her brother's possible suicide as a result of the rape. Accordingly, we decline to disturb the trial court's application of Tenn. R. Evid. 803(2).

Having concluded that the contents of the 911 tape recording were admissible as substantive evidence pursuant to Tenn. R. Evid. 803(2), we need not address whether the contents of the recording qualified for admission as corroborative evidence pursuant to the fresh complaint doctrine. Nevertheless, a brief discussion of the doctrine is warranted as it relates, if only by virtue of contrast, to our subsequent discussion concerning the relevance of the 911 tape recording and its potential for unfair prejudice.

In <u>State v. Kendricks</u>, 891 S.W.2d 597, 603 (Tenn. 1994), our supreme court held that the fresh complaint doctrine allows a prosecutor to enter into evidence in the State's case-in-chief *the fact* of a victim's complaint of a sexual offense. <u>Cf.</u> <u>State v. Livingston</u>, 907 S.W.2d 392, 394 (Tenn. 1995)(eliminating the doctrine of fresh complaint when a child is the victim of sexual abuse). In so holding, the court specifically rejected the previous rule set forth in <u>Phillips v. State</u>, 28 Tenn. 246 (1848), which permitted the introduction during the State's case-in-chief of both the fact of the complaint and the details thereof. <u>Kendricks</u>, 891 S.W.2d at 603. The court concluded that any admission of the *details* of the complaint must be preceded by impeachment of the accuracy of the victim's direct testimony. <u>Id.</u> As the appellant correctly observes in his brief, our supreme court offered the following explanation in rejecting the broader <u>Phillips</u> rule:

> A very real danger lurks in prematurely admitting the details of the
> victim's complaint as evidence in the state's case-in-chief. The
> victim may be impeached on grounds other than the accuracy of his
> or her direct testimony. For example, if a victim were shown to have
> harbored a pre-complaint motive to falsely accuse the defendant of

-14-

rape, the fact that the details of the victim's complaint are consistent with the in-court testimony would be irrelevant in rebuttal of the impeachment testimony. Thus, the Phillips rule clearly invites the risk that the jury would be allowed to hear an irrelevant repetition of the victim's testimony that could not be subject to prompt cross-examination. This potential prejudice threatens the defendant's right to a fair trial as guaranteed by the Fifth and Sixth Amendments to the United States Constitution and Article I, Section 9 of the Tennessee Constitution.

Id. Similarly, in articulating the closely related rule governing the admissibility of prior consistent statements, this court has held that, when an opponent attempts to show that a witness was motivated to lie or slant testimony, we allow evidence of the witness' previous statement that was made *before* the motive to lie arose and that is consistent with the in-court testimony. State v. Tizard, 897 S.W.2d 732, 746 (Tenn. Crim. App. 1994); see also State v. Thompson, No. 03C01-9807-CC-00238, 1999 WL 160961, at *7 (Tenn. Crim. App. at Knoxville, March 24, 1999), perm. to appeal denied, (Tenn. 1999), cert. denied, __ U.S. __, 120 S. Ct. 1164 (2000). In this case, PC's statements to the 911 operator were made after PC had allegedly developed the motive to lie. Thus, under both the fresh complaint doctrine and the prior consistent statement rule, the fact that those statements were consistent with PC's in-court testimony was irrelevant in rebuttal of attempts by the appellant to demonstrate that PC was motivated to fabricate her accusations.

However, while we agree that consistencies between the contents of the 911 tape recording and PC's in-court testimony were irrelevant to the primary issue of whether PC fabricated her "accusations out of whole cloth," we do not agree that the contents of the recording were *otherwise* irrelevant to that issue. To explain, we now turn to the appellant's contention that the contents of the 911 tape recording were inadmissible pursuant to Tenn. R. Evid. 403. Specifically, the appellant asserts that PC's emotional condition during the conversation "was extremely inflammatory and . . . [the tape recording] added nothing relevant that . . . [PC] did not testify to in the courtroom."

Preliminarily, Tenn. R. Evid. 401 broadly provides that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Relevant evidence is admissible pursuant to Tenn. R. Evid. 402. Two aspects of the 911 tape recording were highly relevant to the issue of whether PC fabricated her accusations of rape: (1) PC's report to the 911 operator of her brother's possible suicide before mentioning her rape by her brother and PC's expression of concern for her brother; and (2) PC's emotional condition throughout her conversation with the 911 operator.

Of course, Tenn. R. Evid. 403 prohibits the introduction of even relevant evidence "if its probative value is outweighed by the danger of unfair prejudice . . . or by considerations of . . . needless presentation of cumulative evidence." With respect to the cumulative nature of the 911 tape recording, PC's brief account to the 911 operator of the events of that morning was indeed cumulative of her testimony at trial; however, the manner in which she delivered her account,

including the two aspects of her account mentioned above, was not. Nevertheless, the appellant argues that the manner in which PC delivered her account to the 911 operator was unfairly prejudicial. "Prejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror.'" State v. Collins, 986 S.W.2d 13, 20 (Tenn. Crim. App. 1998)(citation omitted)(emphasis added). We must agree with the State that the primary purpose in introducing the 911 tape recording was, to the contrary, to provide the jurors with the best possible view of PC's demeanor immediately following these offenses and so enhance the jurors' ability to judge the credibility of PC's accusations of rape. Cf. State v. Henry, No. 01C01-9505-CR-00161, 1999 WL 92939, at **25-26 (Tenn. Crim. App. at Nashville, February 25, 1999), perm. to appeal granted, (Tenn. 2000). This issue is without merit.

### c.     DNA Analysis

The next issue raised by the appellant concerns the trial court's admission into evidence of Agent Minor's testimony concerning the inconclusive results of his RFLP DNA analysis of semen samples obtained from the victim and of blood samples obtained from the appellant. Although not entirely clear from his brief, the appellant appears to argue that the trial court erred in allowing Minor to testify that his analysis did not *exclude* the appellant as a source of the semen because the trial court prevented defense counsel from inquiring whether the analysis *included* the appellant. More specifically, the appellant appears to argue that the trial court erred in ruling that any inquiry by defense counsel during cross-examination concerning the appellant's inclusion as a source of the semen would "open the door" to otherwise inadmissible testimony by Minor.

Prior to the appellant's trial and in accordance with Tenn. R. Crim. P. 16(a)(1)(D), the State provided defense counsel with a report by Minor indicating that he had performed an RFLP DNA analysis of semen samples obtained from the victim and blood samples obtained from the appellant and that the results of his analysis were inconclusive. On the day before trial, however, the State additionally notified defense counsel that it intended to elicit testimony from Minor that, although the results of his DNA analysis were inconclusive, he had extracted two faint bands of DNA from the semen and had visually compared the bands with the appellant's DNA. According to the State, the agent would testify that the two faint bands of DNA appeared to match the appellant's DNA, although the agent was unable to assign any statistical significance to the similarities.

Defense counsel strenuously objected to the admission of Minor's testimony concerning the two matching bands of DNA. Defense counsel argued, in essence, that the testimony was inadmissible pursuant to Tenn. R. Evid. 702. Moreover, defense counsel noted that the information concerning the two faint, matching bands was not included in Minor's report, and, accordingly, he was not prepared to rebut Minor's testimony. The court ruled that, in light of the lack of any notice to the appellant and Minor's inability to assign statistical significance to the matching bands, Minor could only testify that the results of his analysis were inconclusive, and those results did not exclude the appellant as the possible source of the semen.

Subsequently, however, during Minor's testimony, the trial court further ruled that, if defense counsel asked Minor whether his analysis conclusively *included* the appellant, the trial court would permit Minor to testify concerning the matching bands of DNA. The court explained:

> As I understand, what he would have testified to is that there was evidence that would have included him - - or that suggested that there were some similarities, but it wasn't sufficient enough to make it a conclusive test, and what I warned you about . . . if you asked that question, you are going to be opening the door to his testifying to something that I previously ruled he couldn't testify to.
>
> So that is the reason I told you that. You know, I didn't tell you that you couldn't ask it. I told you, if you asked it, in essence, you would be opening the door, and he would be allowed then to testify that two of these bands indicated to him or were similar . . . in other words, there was some evidence that it could include him, but it wasn't conclusive evidence.

Notwithstanding the above ruling, the court did permit defense counsel to argue to the jury in closing that the DNA analysis did not conclusively include the appellant.

Following the appellant's trial, at the hearing on the appellant's motion for new trial, defense counsel challenged the trial court's ruling effectively precluding him from inquiring of Minor whether the results of his DNA analysis conclusively included the appellant as the source of the semen obtained from the victim. In support of his argument, the appellant submitted to the trial court an affidavit by Dr. Ronald T. Acton, currently a professor of medicine at the University of Alabama at Birmingham, Alabama and the director of the Department of Medicine's Immunogenetics Program and Immunogenetics/DNA Diagnostic Laboratory. Dr. Acton concurred in Minor's conclusion that the results of his RFLP DNA analysis were inconclusive. However, he noted that, in conducting the visual comparison of DNA bands or "autorads," Minor had failed to follow the recommendations of the National Research Council's publication, "DNA Technology in Forensic Science," "a learned treatise regarding the technical issues in RFLP analysis." Moreover, the agent did not follow the guidelines of the Technical Working Group on DNA Analysis Methods, "a group established under the auspices of the FBI and includ[ing] forensic scientists and laboratory directors." Finally, the agent did not comply with the Tennessee Bureau of Investigation Crime Laboratory's "Procedures for the Detection of Restriction Fragment Length Polymorphisms in Human DNA." In any event, the doctor noted that

> a visual observation of the one or two possible matching bands is insignificant in the absence of a statistical basis for interpretation. The National Research Council's report, DNA Technology in Forensic Science, states that: "To say two patterns match, without providing any scientifically valid estimate (or, at least, an upper bound) of the frequency with which such matches might occur by chance, is meaningless."

Upon reviewing the above affidavit, the trial court indicated that it might have ruled differently had the appellant submitted at trial the information contained in the affidavit. However, the court further concluded that Minor's testimony was "innocuous" and had "no weight." Accordingly, the court declined to grant any relief to the appellant.

In reviewing the trial court's actions in this appeal, we believe it will be helpful to first identify those issues that are not before this court in this appeal. For example, neither party contests the admissibility of Minor's testimony that the results of his RFLP DNA test were inconclusive. Moreover, the appellant conceded at trial and concedes in his brief on appeal that "inconclusive . . . by definition means that the appellant was neither included nor excluded by the test." Thus, the appellant conceded to the trial court that "[t]o allow the State to . . . ask whether or not . . . [the appellant] was excluded, I do not think, in and of itself, is error on the Court's part." The appellant does not argue otherwise with any clarity in this appeal.[3] Finally, neither party contests the trial court's ruling that Minor's testimony concerning the matching bands of DNA was generally inadmissible. As noted above, the only issue before this court is whether the trial court erred in ruling that the appellant would open the door to otherwise inadmissible testimony concerning the matching DNA bands if defense counsel inquired of Minor whether his analysis conclusively included the appellant.

In State v. Land, No. M1999-01023-CCA-R3-CD, 2000 WL 678787, at *11 (Tenn. Crim. App. at Nashville, April 28, 2000), this court expressly acknowledged our prior implicit adoption of the "doctrine of curative admissibility." See also State v. Chearis, 995 S.W.2d 641, 645 (Tenn. Crim. App. 1999). In Land, we explained this doctrine:

> Most often employed in criminal cases where the "door" to a particular subject is opened by defense counsel on cross-examination, the doctrine of curative admissibility permits the State, on redirect, to question the witness to clarify or explain the matters brought out during, or to remove or correct unfavorable inferences left by, the previous cross-examination. This doctrine provides that "[w]here a defendant has injected an issue into the case, the State may be allowed to admit otherwise inadmissible evidence in order to explain or counteract a negative inference raised by the issue defendant injects." In other words, "[i]f A opens up an issue and B will be prejudiced unless B can introduce contradictory or explanatory

---

[3]The appellant has entitled this issue, "THE TRIAL COURT ERRED BY ALLOWING THE STATE TO PRESENT EVIDENCE CONCERNING DNA ANALYSIS IN THE PRESENCE OF THE JURY WHICH WAS INACCURATE AND UNDULY PREJUDICIAL TO THE APPELLANT." Again, the only evidence presented to the jury was Minor's testimony that the results of his DNA analysis were inconclusive, and the results of his analysis did not exclude the appellant as a possible source of the semen obtained from the victim. Because the appellant has declined to challenge the admissibility of Minor's testimony that the results of his analysis were inconclusive and in light of the appellant's concession that "inconclusive" results, by definition, mean that the appellant was not excluded as the source of semen, we fail to comprehend how Minor's testimony was "inaccurate."

> evidence, then B will be permitted to introduce such evidence, even
> though it might otherwise be improper."

No. M1999-01023-CCA-R3-CD, 2000 WL 678787, at *11 (citations omitted). The court cautioned, however, that "[s]ince the application of the doctrine of curative admissibility is based on the notion that the jury might be misled if contradictory evidence was excluded, the doctrine should not justify admission of that evidence when it is likely to do more harm in this respect than good." Id. This court reviews a trial court's application of the doctrine under an abuse of discretion standard. Id. at *12.

We note that, in this case, there was no danger that the jury would be misled by defense counsel's elicitation of testimony by Minor that the results of his analysis did not conclusively include the appellant. This testimony, like Minor's testimony that the results of his analysis did not exclude the appellant, would have been accurate. Moreover, the introduction of Minor's testimony concerning the matching DNA bands would not have clarified his testimony concerning the appellant's inclusion because the State conceded prior to trial that Minor's observation of the matching DNA bands had no measurable significance. Thus, testimony concerning the matching DNA bands was likely to do more harm than good. Land, No. M1999-01023-CCA-R3-CD, 2000 WL 678787, at *11. We conclude, therefore, that the trial court abused its discretion by ruling that defense counsel would "open the door" to Minor's testimony concerning the matching bands of DNA if defense counsel inquired whether the results of Minor's analysis conclusively included the appellant. However, we agree with both the trial court and the State that any error committed by the trial court was entirely harmless. Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b). Again, defense counsel was permitted to argue in closing that Minor's DNA analysis did not conclusively include the appellant as the source of the semen. Indeed, as conceded by the appellant, an "inconclusive" DNA analysis by definition means that the appellant was neither included nor excluded. Thus, Minor's testimony that the appellant was not excluded by his analysis was merely a reiteration of his testimony that the results of his analysis were inconclusive. In sum, the trial court correctly observed at the hearing on the appellant's motion for new trial that Minor's testimony was innocuous. This issue is without merit.

### d. Testimony Concerning the Appellant's Arrest

The appellant next contends that the trial court erred in admitting at trial testimony concerning the circumstances of his arrest. Prior to trial, the appellant submitted a motion to the trial court arguing that this evidence was irrelevant, Tenn. R. Evid. 401 and 402, and any probative value of the testimony was substantially outweighed by the danger of unfair prejudice, Tenn. R. Evid. 403. The trial court denied the appellant's motion. We conclude that the trial court did not abuse its discretion in admitting the disputed testimony. DuBose, 953 S.W.2d at 653-654; State v. Kennedy, 7 S.W.3d 58, 68 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1999).

In concluding that testimony concerning the circumstances of the appellant's arrest was admissible pursuant to Tenn. R. Evid. 401 and 402, we note our supreme court's prior acknowledgment of the following "well recognized principle of criminal law":
> "The actions and behavior of accused when charged with the crime,
> or when confronted with the consequences or with the scene or

-19-

> surroundings of the crime with which he is charged, or when brought
> before the prosecuting witness for identification, or at the trial, are
> peculiarly relevant.  In receiving evidence of this kind, it is not easy,
> if at all possible, for courts to draw any line segregating those acts
> which to some minds may seem significant of guilt from those which
> are irrelevant because justifying no such inference.  Any ex post facto
> indication by accused of a desire to evade prosecution may be shown
> as one of series of circumstances from which guilt may be inferred."

Marable v. State, 313 S.W.2d 451, 459 (Tenn. 1958)(citation omitted); see also State v. Harris, 839 S.W.2d 54, 71 (Tenn. 1992)(inferring guilt from a defendant's refusal to provide court-ordered handwriting samples).  The above principle has existed for more than 150 years and was not affected by the enactment of the Tennessee Rules of Evidence.  State v. Johnson, No. 02C01-9504-CC-00097, 1997 WL 80970, at *5 (Tenn. Crim. App. at Jackson, February 27, 1997).  The principle encompasses proof concerning the circumstances of a defendant's arrest, including efforts by a defendant to resist arrest.  Id. at *6; see also State v. Zagorski, 701 S.W.2d 808, 813 (Tenn. 1985)(holding that evidence that defendant, at the time of his capture, rammed a police car and opened fire on police officers inside was relevant as one of several circumstance from which a jury could infer guilt); State v. Braggs, 604 S.W.2d 883, 886 (Tenn. Crim. App. 1980)(holding that testimony concerning the appellant's arrest in which he attempted to hide in the basement of a house was relevant to show his consciousness of guilt).

Accordingly, proof of the appellant's knowledge that the police were attempting to contact him concerning PC's accusations, his refusal to answer the police officers' knock on his door on March 6, 1996, his acquisition of a rifle upon the officers' arrival at his home, and his refusal to surrender to the police for twenty minutes were circumstances relevant to his guilt of the charged offenses.  Moreover, contrary to the appellant's arguments in his brief, we do not believe that the testimony at issue posed any danger of "elicit[ing from the jury] emotions of 'bias, sympathy, hatred, contempt, retribution, or horror.'" Collins, 986 S.W.2d at 20 (citation omitted); Tenn. R. Evid. 403.[4] This issue is without merit.

### d.      Prosecutorial Misconduct

The appellant next asserts that the prosecutor in this case committed prosecutorial misconduct during closing argument.  We agree with the State that the appellant has waived this issue due to his failure to proffer a contemporaneous objection to the challenged remarks.  State v. Green, 947 S.W.2d 186, 188 (Tenn. Crim. App. 1997); State v. Smith, No. E1999-00386-CCA-R3-

---

[4]In support of his argument, the appellant cites Detective Stair's reference to the appellant "barricading himself in the house" on March 6, 1996.  The appellant argues in his brief that this statement by Detective Stair "was highly prejudicial and elicited by the state for the sole purpose of inflaming the jury."  In fact, Detective Stair's comment was not elicited by the State at all but occurred during defense counsel's cross-examination of the detective and in the context of defense counsel's attempts to ascertain the extent of the detective's knowledge concerning events on March 6.  Moreover, the detective stated to the jury that he was not present at the time of the appellant's arrest.  Finally, defense counsel did not request any curative instruction by the trial court concerning the detective's characterization of the appellant's conduct at the time of his arrest.  Tenn. R. App. P. 36(a).

CD, 2000 WL 690159, at *10 (Tenn. Crim. App. at Knoxville, May 23, 2000); State v. Dodson, No. M1998-00067-CCA-R3-CD, 2000 WL 378347, at *13 (Tenn. Crim. App. at Nashville, April 14, 2000); Tenn. R. App. P. 36(a). Moreover, we find no plain error warranting relief. See, generally, State v. Smith, 24 S.W.3d 274, 282-283 (Tenn. 2000); Tenn. R. Crim. P. 52(b).

**e.      Cumulative Error**

Finally, the appellant contends that the combination of errors committed during his trial denied him a fair trial. See State v. Brewer, 932 S.W.2d 1, 28 (Tenn. Crim. App. 1996). We have carefully reviewed the record in this case and have considered those issues that have not been waived by the appellant or that are otherwise subject to review by this court. We have concluded that, with respect to the appellant's incest conviction, one error occurred in the trial court's failure to require an election of offenses by the State, and we have remedied that error by reversing the appellant's conviction and remanding that case to the trial court for a new trial. As to the appellant's convictions of aggravated rape, we find no cumulative error warranting further relief. This issue has no merit.

### III.  Conclusion

For the foregoing reasons, we reverse the appellant's conviction of incest and remand that case to the trial court for a new trial. We otherwise affirm the judgments of the trial court.


_____
NORMA McGEE OGLE, JUDGE